DANIEL V. BEHESNILIAN, ESQ. (SBN 075805)
LAW OFFICES OF DANIEL V. BEHESNILIAN
8484 Wilshire Blvd., Suite 700
Beverly Hills, CA 90211
(310) 854-6972 Telephone
(310) 854-0128 Fax
Email: daniel@dvblaw.net

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MATTHEW JASON KROTH,<br>aka "Jason Kroth"<br>aka "Speedy"<br><br>Defendant. | Case No.: 2:23-CR-465-MEMF<br><br>**DEFENDANT MATTHEW JASON KROTH SENTENCING POSITION**<br><br>**Sentencing Date: January 28, 2026**<br>**Time: 10:00 am**<br>**Judge: Hon. Mamme Ewusi-Mensah Frimpong** |

TO THE HONORABLE MAMME EWUSI-MENSAH FRIMPONG, UNITED STATES DISTRICT COURT JUDGE, AND ASSISTANT UNITED STATES ATTORNEY, MATTHEW J. TAKO

  Defendant Matthew Jason Kroth, by and through his counsel of record, Daniel V. Behesnilian, hereby submits the following sentencing position and the accompanying memorandum of points and authorities.

//
//

1

Dated: January 13, 2026

Respectfully submitted,

/s/ Daniel V. Behesnilian
Daniel V. Behesnilian
Attorney for Defendant
Matthew Jason Kroth

## INTRODUCTION

Before his involvement in the instant offense, Matthew Jason Kroth's life had been shaped by profound trauma, instability, and untreated addiction. His childhood was marked by repeated sexual abuse, early exposure to drugs, parental neglect, and chronic homelessness. By the age of seven, his father had introduced him to narcotics and drug trafficking; by age twelve, Mr. Kroth was addicted to crack cocaine; and by age thirteen, he was homeless and living on the streets. From adolescence forward, Mr. Kroth cycled between incarceration and homelessness, never receiving meaningful intervention for the psychological and emotional damage inflicted upon him during his formative years.

His criminal history, which the Court will review in detail, reflects not a pattern of calculated criminality but the predictable consequences of a life dominated by addiction, untreated mental illness, and the absence of stability or guidance. Mr. Kroth entered adulthood already severely impaired by trauma, substance dependence, and unresolved psychological injuries that shaped nearly every decision he would later make.

Against this background, the offenses of conviction occurred during one of the darkest chapters of his life. From approximately 2020 through January 2023, Mr. Kroth was homeless in Studio City with his girlfriend, using methamphetamine daily and struggling simply to survive. His actions during this period were reckless and destructive, but they were driven by addiction and desperation, not by greed, sophistication, or long-term planning.

Although the Presentence Report attributes millions of dollars in loss to the conspiracy as a whole, the record establishes that Mr. Kroth personally received approximately one-half million dollars from the offense conduct — a fraction of the total sums involved and far less than that obtained by the principal actors. His role was not that of a mastermind or organizer, but of an addict caught in the orbit of far more sophisticated individuals.

From the moment of his arrest, Mr. Kroth has accepted responsibility for his actions. He admitted the fraud and the drug trafficking conduct to law enforcement, acknowledged the harm he caused, and expressed genuine remorse.

This sentencing therefore presents not only a question of punishment, but of whether the Court will impose a sentence that recognizes the full reality of who Mr. Kroth is, how he arrived here, and the genuine possibility of rehabilitation that

now exists for the first time in his life. The Presentence Report tells the story of a life shaped from its earliest years by trauma, instability, exploitation, and untreated addiction. Mr. Kroth did not enter adulthood with the tools necessary to form healthy relationships, make rational decisions, or pursue a stable future.

Instead, he entered it carrying the psychological weight of repeated abuse, chronic homelessness, and early exposure to drugs — burdens that would dominate his life for decades and ultimately form the backdrop of the conduct before the Court.

### A. A Childhood of Extreme Trauma and Instability

Mr. Kroth was born in 1973 in Columbus, Georgia. When he was five years old, his parents separated, fracturing what little stability existed in his home. His early childhood was marked by fear and emotional volatility. He recalls that his mother would wake the family repeatedly throughout the night, terrified and checking doors and windows, behavior later attributed to her own history of abuse. Between the ages of five and seven, while living in California with his father, Mr. Kroth and his brother were repeatedly molested by a neighbor who supplied them with alcohol. Overcome with shame and fear, Mr. Kroth never disclosed the abuse to his father. When he was nine years old, during a visit to his mother in Georgia, she also molested him. He has described this as devastating, stating that it permanently altered his ability to form healthy relationships with women.

By age seven, Mr. Kroth's father had begun using and selling drugs. He taught his young son what cocaine looked like, how to weigh it, and involved him in drug transactions. At twelve, Mr. Kroth already understood the mechanics of drug trafficking. Soon after, his father initiated a sexual relationship with Mr. Kroth's fifteen-year-old half-sister, whom Mr. Kroth had helped bring into the home from foster care. The guilt and helplessness of that experience continues to burden him.

At thirteen, Mr. Kroth was addicted to crack cocaine and homeless. His father lost their home and began living in a van. Mr. Kroth drifted between friends and the street. After a close friend died in an accident when he was seventeen, he again became homeless. From that point forward, his life became a cycle of homelessness and incarceration that has persisted into adulthood.

### B. Mental Health, Addiction, and the Absence of Meaningful Intervention

Mr. Kroth has lived almost his entire life under the weight of untreated psychological trauma and severe substance addiction. The Presentence Report

4

documents that he has been diagnosed with anxiety, PTSD, depression, and ADHD. He has experienced suicidal ideation in the past and currently receives medication for anxiety, depression, and insomnia while incarcerated.

Substance abuse entered Mr. Kroth's life at an age when most children are still learning to read. He was given alcohol at age six by the individual who molested him. By age seven, he was using marijuana. By twelve, he was addicted to crack cocaine. By fourteen, he had begun using methamphetamine — the drug that would come to dominate his life for decades. His addiction was not merely habitual; it was compulsive and lifelong.

He has struggled with methamphetamine dependence nearly his entire adult life, cycling through brief periods of sobriety followed by relapse, homelessness, and incarceration. Although he attempted treatment on multiple occasions, those efforts were short-lived and insufficient in light of the extreme trauma and neurological damage he suffered in childhood.

**B. A Path Forward**

For the first time in his adult life, Mr. Kroth has a realistic and verified path toward stability and rehabilitation. Upon release, Mr. Kroth will reside with his sister, Kathy Michelle Jameson, in Tarzana, California. Both Ms. Jameson and Mr. Kroth's brother, Richard Kroth, have confirmed their willingness to support him.

The Probation Office conducted a home inspection on April 30, 2025, and found the residence to be modest, clean, and appropriate, with no officer safety concerns. The residence is located in a gated community and is in close proximity to Tarzana Treatment Center, providing immediate access to long-term substance-abuse treatment. Mr. Kroth has articulated clear and realistic goals: to complete long-term residential treatment, maintain sobriety, rebuild his relationship with his family, and pursue employment and community involvement. He has expressed a desire to give back by mentoring individuals struggling with addiction and speaking with inmates and at-risk youth about the consequences of substance abuse. He also intends to continue developing his lifelong passion for art, which has served as a primary coping mechanism during incarceration and helped him develop discipline, patience, and emotional stability.

This combination of family support, structured treatment access, and personal commitment to rehabilitation provides the strongest indicator yet that Mr. Kroth can successfully reintegrate into society.

## THE OFFENSE CONDUCT AND MR. KROTH'S REMORSE

The conduct before the Court occurred during the most destabilized period of Mr. Kroth's life. From approximately 2020 through January 2023, Mr. Kroth was homeless in Studio City, severely addicted to methamphetamine, and living from motel to motel with his girlfriend. During this period, Mr. Kroth participated in fraudulent activity involving the Wilding estate and the Tascon property, and he possessed methamphetamine with the intent to distribute. On January 24, 2023, law enforcement executed a search warrant at Mr. Kroth's hotel room and recovered approximately 120 grams of methamphetamine, along with cutting agents, packaging materials, and a digital scale.

The investigation further established that proceeds from the Tascon transaction were deposited into accounts associated with Mr. Kroth and his co-conspirator, and that portions of those proceeds were later used toward the purchase of the Woodlake residence. Although the conspiracy involved large financial transactions, the record reflects that Mr. Kroth personally received approximately $500,000 — a fraction of the total amounts attributed to the broader scheme and substantially less than that obtained by the principal actors. His role was not that of an organizer or leader. Rather, he functioned as an impaired and vulnerable participant whose conduct was shaped by addiction and the influence of others with far greater sophistication and control over the scheme.

From the moment of his arrest, Mr. Kroth has accepted responsibility. When interviewed by Probation in October 2024, Mr. Kroth stated: *"I immediately took responsibility for what I did. I would like to go home a different person…I'm not a violent person"* and explained that he committed the instant offense because he is a drug addict and needed to make money to support his habit.

This remorse is genuine, consistent, and supported by his conduct while incarcerated, including completion of the Metropolitan Detention Center Drug Treatment Program, and his ongoing commitment to sobriety.

## THE SENTENCING GUIDELINES

### A. Guideline Framework

The Presentence Report calculates a Total Offense Level of 32. That calculation is driven by the wire-fraud count, which produces an Adjusted Offense Level of 35, reduced by three levels for acceptance of responsibility. The drug-trafficking count yields an Adjusted Offense Level of 24 and therefore does not affect the combined offense level.

6

However, two components of the guideline calculation materially overstate Mr. Kroth's culpability:

1. The inclusion of the $1,940,000 Lowenstein loss, and
2. The application of the two-level enhancement for ten or more victims.

These errors improperly inflate the advisory range.

**B. The Loss Calculation Substantially Overstates Mr. Kroth's Culpability**

The PSR attributes a total loss of $3,887,051, composed of:
-$447,051 (Wilding estate)
-$1,940,000 (Lowenstein estate)
-$1,500,000 (Tascon transaction)

Mr. Kroth does not dispute inclusion of the Wilding and Tascon amounts. He expressly objects to the inclusion of the Lowenstein loss.

The PSR provides no factual narrative establishing that Mr. Kroth participated in, directed, facilitated, or was even aware of the Lowenstein scheme. The detailed offense conduct addresses the Wilding and Tascon matters extensively but contains no factual findings describing any act by Mr. Kroth concerning the Lowenstein estate. The sole reference is the conclusory statement that:

"...Kroth and his co-conspirators caused the Lowenstein residence to be sold for $1,940,000 in a probate auction on November 3, 2023".

That statement is unsupported by any underlying conduct attributed to Mr. Kroth. Critically, the factual basis executed with Mr. Kroth's plea contains no admission concerning the Lowenstein property. The government chose not to include any Lowenstein conduct in the factual basis, establishing that the Lowenstein transaction was not within the scope of the jointly undertaken activity to which Mr. Kroth pled.

Under U.S.S.G. §1B1.3, a defendant may be held responsible only for conduct that was within the scope of the jointly undertaken criminal activity, in furtherance of that activity, and reasonably foreseeable. The PSR establishes none of these requirements as to Mr. Kroth for the Lowenstein transaction.

7

Removing the Lowenstein amount results in a corrected total loss of: $1,947,051

This places the loss below the $3.5 million threshold of §2B1.1(b)(1)(K), requiring a two-level reduction in the offense level.

### C. The Ten-Victim Enhancement Is Unwarranted

The PSR applies a two-level enhancement for ten or more victims. That enhancement relies heavily on victims arising from the Lowenstein conduct. Because the Lowenstein transaction is not properly attributable to Mr. Kroth, those individuals and entities must be excluded from the victim count. Once removed, the number of remaining victims falls below ten, and the enhancement no longer applies.

### D. Corrected Guideline Impact

Removing the Lowenstein loss and the ten-victim enhancement materially reduces the advisory guideline range and produces a sentencing framework that accurately reflects Mr. Kroth's actual conduct and culpability.

## The Court Should Grant a Downward Variance

Even after correcting the guideline calculation errors described above, the advisory range continues to substantially overstate Mr. Kroth's culpability and the purposes of sentencing. Accordingly, the Court should impose a downward variance pursuant to 18 U.S.C. § 3553(a). The Presentence Report calculates a Total Offense Level of 32, which, with Mr. Kroth's Criminal History Category III (four criminal history points), yields an advisory guideline range of 210 to 262 months. However, when the Court excludes the improperly attributed Lowenstein loss and removes the improperly applied ten-victim enhancement, the offense level is reduced by four levels, from 32 to 28. At Offense Level 28 and Criminal History Category III, the resulting advisory range is approximately 97 to 121 months.

Even from that corrected range, a further downward variance is warranted. The defense respectfully requests a sentence of 144 months (12 years). Such a variance is justified by the extraordinary mitigating circumstances in this case, particularly Mr. Kroth's horrific childhood, lifelong trauma, untreated mental illness, and decades-long addiction, all of which directly contributed to the conduct before the Court.

Federal courts have repeatedly recognized that severe childhood trauma, addiction, and mental health disorders constitute compelling grounds for variance under § 3553(a). See *United States v. Autery*, 555 F.3d 864, 875 (9th Cir. 2009); *United States v. Whitehead*, 532 F.3d 991, 993–94 (9th Cir. 2008); *United States v. Chase*, 560 F.3d 828, 830–31 (8th Cir. 2009); and *United States v. Walter*, 256 F.3d 891, 895–96 (9th Cir. 2001).

A sentence of 144 months reflects the seriousness of the offense, provides just punishment, protects the public, and, most importantly, gives Mr. Kroth the structure and treatment necessary to finally break the cycle of addiction and recidivism. Longer incarceration would not further the goals of sentencing and would only warehouse a deeply traumatized individual without addressing the root causes of the offense.

## THE § 3553(a) FACTORS

### A. The Nature and Circumstances of the Offense

The offenses before the Court are serious and caused real harm. Mr. Kroth does not minimize that reality. However, the circumstances under which these offenses occurred are critical to a just and proportionate sentence.

At the time of the conduct, Mr. Kroth was homeless, deeply addicted to methamphetamine, and suffering from untreated psychological trauma rooted in decades of abuse and instability. His conduct was reckless and destructive, but it was driven by addiction and desperation — not greed, long-term planning, or financial sophistication.

The record further establishes that Mr. Kroth personally obtained approximately $500,000 from the offense conduct — a fraction of the total amounts attributed to the broader conspiracy and far less than that obtained by the principal actors. He was not the organizer or leader of the scheme. Rather, he was a deeply impaired participant whose actions were shaped by addiction and the influence of more sophisticated co-conspirators.

### B. The History and Characteristics of the Defendant

Few cases present a more compelling history of mitigating personal circumstances. Mr. Kroth's life has been shaped by repeated sexual abuse, early exposure to drugs, chronic

homelessness, untreated mental illness, and a complete absence of meaningful intervention. By childhood, he was exposed to drug trafficking and sexual exploitation. By adolescence, he was addicted to crack cocaine and living on the streets. By adulthood, his life had become a continuous cycle of incarceration and homelessness.

Despite these profound disadvantages, Mr. Kroth has demonstrated genuine change. While incarcerated, he completed the Bureau of Prisons' six-month drug treatment program (NDAP), remained drug-free, and committed himself to long-term treatment upon release. He now has verified housing, family support, access to treatment, and realistic goals centered on sobriety, stability, and service to others.

This case is not about excusing criminal conduct. It is about recognizing that meaningful punishment must also promote rehabilitation and reduce the risk of future harm.

### C. The Need for the Sentence Imposed

A just sentence must reflect the seriousness of the offense, promote respect for the law, provide just punishment, protect the public, and provide the defendant with necessary treatment and care. Those objectives are best served by a sentence of 144 months (12 years).

Mr. Kroth is not a violent offender. He is not a career organizer of crime. He is a severely traumatized addict who, for the first time in his adult life, has begun the process of recovery. His criminal history of four points reflects the predictable consequences of lifelong addiction and untreated trauma, not entrenched criminality.

A twelve-year sentence provides substantial punishment and accountability while still allowing Mr. Kroth the opportunity to meaningfully rehabilitate and reintegrate into society. Longer incarceration would not reduce recidivism. Sustained treatment and supervision will. Continued treatment and supervision offer the strongest protection to the public and the greatest likelihood of successful reintegration.

### D. The Need to Avoid Unwarranted Sentencing Disparities

A sentence driven by inflated loss figures and improperly attributed victims would create unwarranted disparities between Mr. Kroth and similarly situated defendants whose roles and culpability are accurately reflected in their guideline calculations.

Correcting the guideline errors in this case is essential to maintaining proportionality, fairness, and public confidence in the sentencing process.

## CONCLUSION

This Court is not presented with a defendant beyond redemption. It is presented with a man whose life has been dominated by trauma, addiction, and instability — and who has finally begun to change.

Mr. Kroth has accepted responsibility from the outset, expressed genuine remorse, and demonstrated meaningful commitment to rehabilitation. The record shows a real opportunity for recovery that did not previously exist.

When the improperly attributed Lowenstein loss and ten-victim enhancement are removed, the advisory guideline range more accurately reflects Mr. Kroth's true conduct and culpability. Combined with the extraordinary mitigating factors in his personal history, a sentence substantially below the range calculated in the Presentence Report is sufficient — but not greater than necessary — to satisfy the purposes of sentencing.

Mr. Kroth respectfully asks this Court to impose a sentence that recognizes the seriousness of the offense but also acknowledges the genuine possibility of a different future.

For these reasons, the defense respectfully requests that the Court reduce the guideline calculation by four levels to Offense Level 28 and impose a downward variance sentence of 144months (12 years), which is sufficient but not greater than necessary to satisfy the purposes of sentencing under § 3553(a).

Dated: January 13, 2026                     Respectfully submitted,

/s/ Daniel V. Behesnilian
Daniel V. Behesnilian
Attorney for Defendant
Matthew Jason Kroth