TODD BLANCHE
Deputy Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
ALEXANDER B. SCHWAB
Assistant United States Attorney
Acting Chief, Criminal Division
ANDREW BROWN (Cal. Bar No. 172009)
Assistant United States Attorney
Major Frauds Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-0102
    Facsimile: (213) 894-6269
    E-mail:   andrew.brown@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. 2:23-CR-465-MEMF |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION; DECLARATION OF INSPECTOR VERSOZA; EXHIBITS |
| v. | |
| MATTHEW JASON KROTH, aka "Jason Kroth," aka "Speedy," | Sentencing:  January 28, 2026                10:00am |
| Defendant. | |

## I.   THE LOWENSTEIN LOSSES AND VICTIMS WERE AT LEAST FORSEEABLE TO DEFENDANT

On December 31, 2025, defendant filed his objections to the Presentence Report (PSR), claiming that he personally was not involved in the Lowenstein estate fraud, and so should be held accountable for less loss and fewer victims, reducing his offense level. (ECF 59.)  Defendant claims that he should not be held

accountable for the Lowenstein estate fraud because it was not mentioned by name in the factual basis of his plea agreement.

Defendant's co-conspirator, Caroline Herrling, pled guilty to the same conspiracy to commit wire fraud charge as defendant did, and was held responsible for three main frauds during that conspiracy which were committed in the following order:  first, stealing the identity of deceased victim Charles Wilding and pretending that he was still alive so she could use a forged power-of-attorney form in his name to liquidate his estate; second, forging the Lowenstein will to leave the Lowenstein estate to Charles Wilding, whose identity co-conspirator Herrling controlled; and third, stealing through identity theft the home of victim Robert Tascon.  Defendant admits that he was involved in the first and last of these frauds, but would have the Court believe that he had nothing to do with the Lowenstein estate fraud in the middle.

Defendant's claim that he was not involved in the Lowenstein estate fraud makes no sense.  Defendant admitted that he had been surveilling Charles Wilding's home because it looked uncared for, and therefore easy to rob.  Charles Wilding was alive and home when defendant first broke into his residence, so defendant used the ruse of performing a "welfare check" to explain his presence in the house. Even though defendant had encountered Charles Wilding during the first break in, defendant went back months later to try again, by which time Mr. Wilding had died.  (PSR ¶¶ 13-15.)  Rather than notify the authorities of Mr. Wilding's death, defendant used it as an opportunity to steal not just his belongings as in a regular burglary, but his entire estate including his home.  First, defendant brought Caroline Herrling into the conspiracy to help him with the

identity theft.  (PSR ¶ 16.)  Defendant admitted stealing mail from the Wilding home and giving it to co-conspirator Herrling for so that they could take over the Wilding estate.  (ECF 27, Plea Agreement ¶ 13; PSR ¶ 15.)  And it was this mail that contained the identifying information for Jackie Shields Lowenstein which enabled the conspirators to steal her identity, forge a will in her name, and name Charles Wilding as the beneficiary of that will.  (Versoza Decl. ¶ 4.)  This conduct was charged in Count One of the Information, to which defendant pled guilty:

> Defendant KROTH and his co-conspirators would steal the identities of mostly elderly victims who owned real property.  D*efendant KROTH and his co-conspirators would forge* trusts, *wills*, and power of attorney forms so that *they could pretend to act on behalf of their victims when stealing their real estate and savings and investment accounts*.

(ECF 16, page 2.)

Moreover, investigators found another fake will, purportedly by "Mary Held," which left "$100,000" to defendant "Jason Matthew Kroth."  (Versoza Decl. ¶ 6.)  It is scarcely believable that defendant's co-conspirators would fabricate a will to the benefit of defendant if, as defendant now claims, he was ignorant of all aspects of the conspiracy save for those portions where there is irrefutable proof of his involvement:  the Wilding fraud, where defendant admitted to burglarizing his home, and the theft of Robert Tascon's home, from which bank records show defendant received proceeds.  Far from the Presentence Report overstating losses, as defendant claims, it has actually understated intended loss:  investigators failed to identify intended victim Mary Held and do not know how large her estate was, so it was not included in the losses provided to Probation.

The Lowenstein estate fraud was, at a minimum, foreseeable to defendant.  Indeed, such frauds were the very reason that defendant brought Caroline Herrling into his criminal find at the Wilding home. Defendant saw from the papers in the Wilding home that Charles Wilding had substantial financial assets, but defendant did not know how to turn them into stolen cash in his own pocket.  But defendant knew that Caroline Herrling would be able to liquidate those assets— and he was right.  By his own admission, defendant turned over to identity thief Caroline Herrling all the mail and other documents he stole from the Wilding home so that she could practice her trade. (Versoza Decl. ¶ 4.)  This included correspondence between Jackie Lowenstein and Charles Wilding's mother, June Wilding.  Caroline Herrling studied Jackie Lowenstein online and learned that she had substantial assets and no will, leaving those assets in the control of a special administrator.  The conspirators then hatched a clever plan:  they would create a fake will for Lowenstein, leaving her assets to Charles Wilding, an identity they already controlled and which was loosely connected to Jackie Lowenstein through her documented friendship with June Wilding, Charles's mother.  To make the will look believable, they used aged paper and purported to "find" the will in June Wilding's safety deposit box, which she had rented since the 1960s.  Critical to this part of the plan was accessing the safety deposit box, which they were able to do because defendant had stolen from the Wilding home not only documents and correspondence relating to Jackie Lowenstein, but also the June Wilding safety deposit box key.  (Versoza Decl. ¶ 4.)  Indeed, text messages between defendant's co-conspirators on February 27

(presumably of 2021) show that it was defendant who supplied them with the safety deposit box key they used in the Lowenstein fraud:

> JAMES KANTOR:  Quick question: where was the [June Wilding] safe deposit box key?
>
> CAROLINE HERRLING: I don't know, you would have to ask [defendant] Jason [Kroth]

(Versoza Decl. ¶ 2.)

So defendant's contribution to the Lowenstein fraud was at a minimum: (1) finding in the Wilding home letters with Jackie Lowenstein, which the conspirators later used to identify her as a victim for identity theft; (2) finding in the Wilding home Charles Wilding's dead body, whose identity the conspirators later used as the beneficiary of the Lowenstein "will"; (3) bringing into the conspiracy Caroline Herrling to capitalize on the assets and identities he had located; and (4) supplying the stolen June Wilding safety deposit box key so co-conspirators Kantor and Herrling could place into that box the fake Lowenstein will, giving the conspirators control over the Lowenstein assets.

Defendant appears to have profited from the Lowenstein fraud, too.  The special administrator had taken the valuables from the Lowenstein estate, including her stamp collection, and placed them into storage, which the conspirators later gained access to after Charles Wilding "declined" to serve as executor for the Lowenstein estate and "asked" Caroline Herrling to take over that role for him. When investigators later searched defendant's long-term motel room, they found the kind of valuables you would expect to find at an estate auction, including a stamp collection.  (Versoza Decl. ¶ 7.)

Given that it was defendant's burglary that led to the discovery of both the Wilding and Lowenstein victims, that he stole their mail

and safety deposit box key, which were both used in the Lowenstein
fraud, and he appears to have received the Lowenstein stamp
collection as part of his share of the loot, it seems very unlikely
that he was ignorant of the Lowenstein fraud, particularly as he was
the express beneficiary of the similarly fabricated Mary Held will.
But even if he ignorant of the Lowenstein fraud, he would still be
accountable for its losses and victims under the sentencing
guidelines, which only require that the criminal conduct of one's co-
conspirators be foreseeable, not that the defendant was actually
aware of it.  Relevant conduct includes "in the case of a jointly
undertaken criminal activity . . . all reasonably foreseeable acts
. . . of others in furtherance of the jointly undertaken criminal
activity."  USSG § 1B1.3(a)(1)(B).  It is axiomatic that if you bring
to an identity thief, like Caroline Herling, all the documents and
mail from a burglarized house in order to commit identity theft, it
is foreseeable that she will do that.  Whether he foresaw the *names*
of all the victims is irrelevant.  If a member of a bank robbery
conspiracy gives a gun to a robber, it would not matter if he knew
whether the robber intended to use it at a Wells Fargo down the
street, or a Bank of America in a different county; he would still be
liable for the resulting bank robbery that he sought and enabled by
supplying the gun.  So, too, here.  Defendant's goal was to help his
co-conspirators commit identity theft, and profit from it, and he
succeeded.  He is liable for the losses and victims that resulted
from his burglary, and from his bringing Caroline Herrling into the
conspiracy to better steal from the victims.

    This result is dictated by the guidelines, which hold each co-
conspirator accountable for the harm from the conspiracy that was in

6

furtherance of it and reasonably foreseeable, even if they had no personal involvement in that harm.  See U.S.S.G. § 1B1.3 Application Note 4(C)(ii) (two defendants jointly conspire to sell fraudulent stocks; one fraudulently obtains $20,000; the other obtains $35,000; each is "held accountable" for $55,000 "because the conduct of each was within the scope of the jointly undertaken criminal activity..., was in furtherance of that criminal activity, and was reasonably foreseeable in connection with that criminal activity").

The Ninth Circuit has repeatedly held that all members of a conspiracy may be liable for the full loss caused by that conspiracy even if they had different roles, or different levels of involvement in it:  "The district court did not commit legal error by imposing an identical loss amount on four co-cocconspirators with differing roles in the conspiracy." United States v. Ayvazyan, 2023 WL 5013366, at *2 (9th Cir. 2023).  See also, United States v. Wells, 804 Fed.Appx. 515, 518 (9th Cir. 2020) ("Wells' guilty plea to the conspiracy allows him to be held liable for the entire loss amount reasonably foreseeable within the scope of his conspiratorial agreement, and not just for his criminal activity.")

Defendant argues, in contrast, that the Court is obliged to proceed item-by-item, and see if there is specific evidence proving defendant's involvement in each particular fraud before the Court can consider the resulting harm at sentencing.  But the Ninth Circuit has expressly rejected this argument:  "[T]o comply with USSG § 1B1.3(a)(1)(B), a district court is not required to proceed item-by-item through a complete list of all losses attributed to a criminal conspiracy and to then make an individualized determination whether or not each item was within the scope of the defendant's 'joint

undertaking' and was 'reasonably foreseeable' to that defendant." United States v. Treadwell, 593 F.3d 990, 1002-03 (9th Cir. 2010).

It is more likely true than not—the preponderance of the evidence standard applicable at sentencing—that defendant was aware of, supported, and profited from the Lowenstein fraud, making him liable for those losses and victims based on his personal actions. But even assuming for the sake of argument that that was not the case, it was certainly foreseeable to defendant that his inviting Caroline Herrling and others to help him take advantage of his criminal find at the Wilding house would result in the kinds of losses that actually occurred, whether or not he was aware of the details.

A "defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility." USSG 3E1.1, app. n. 1(A). Here, defendant has not actually denied his involvement in the Lowenstein fraud; he has merely stated there is insufficient evidence of it. Nevertheless, his disputation of that conduct does appear frivolous. The government is inclined to give defendant the benefit of the doubt for now, but may argue against acceptance of responsibility depending on the position defendant takes at sentencing.

## II. Defendant Abused a Position of Trust By Falsely Claiming to be Conducting a "Welfare Check" on Victim Charles Wilding When He Was in Fact Reconnoitering His Home for a Burglary

In its objections to the Presentence Report, the government sought a two-level enhancement pursuant to Section 3B1.3 because defendant "abused a position of public or private trust," which includes falsely purporting to have such a position. As described in

more detail in its objections, which will not be repeated here, defendant pretended to be authorized to conduct welfare checks on the aged in order to lull victim Charles Wilding into believing that benevolent government officials were looking out for his welfare, when in fact defendant had targeted Wilding as a potential victim and was merely trying to convince him not to report their encounter to the police.  (ECF 56.)

### III. The 3553(a) Factors Call for a Lengthy Sentence

While some of what makes this crime egregious has been captured by the guidelines, the following factors have not been.

#### A. Defendant Contributed to the Suicide of Victim Robert Tascon

Defendant's victim Robert Tascon committed suicide after defendant and his conspirators fraudulently sold his residence.  (PSR ¶ 41-46).  Identity theft is a devastating crime, and stripping a troubled man of his primary asset could push him over the edge, as it appears to have done for Mr. Tascon.  Travis Hartgraves, the case manager at the law firm that represented Mr. Tascon in the lawsuit over the fraudulent sale of Mr. Tascon's house, befriended Mr. Tascon, and explained:

> . . . . Mr. Tascon believed there was a long-term plan to fraudulently sell the property.  The house was the last thing and asset he had to his name (although he still had monthly payments from the trusts). Mr. Hartgraves said, "The fraudulent sale just about crashed him."  The only time he was left alone by Ms. Williams and her father, he committed suicide.

> Mr. Hartgraves, who had extensive involvement in the discovery process for the lawsuits, observed Mr. Tascon's fluctuating emotional state.  Mr. Hartgraves said that Mr. Tascon would be in a good mood, then down in the dumps.  Mr. Tascon told him that "I am never going to get my house back." The fraudulent sale of his home was the final straw; it consumed him.  The lawsuit was more than he could deal with.  Mr. Tascon did not know the people listed in the

> fraudulent sale of his house, like Janice Yeh and Jason Kroth. Mr. Tascon left a will bequeathing his assets to Ms. [Miracle] Williams, however with the fraudulent sale of the Encino home, he had nothing left to leave Ms. Williams.
>
> Mr. Hartgraves law firm were engaged in a legal battle against the buyer of the Encino home; however, after Mr. Tascon's death, they did not have any funding to continue the legal fight. Mr. Hartgraves firm negotiated a small settlement for Mr. Tascon's estate.

(Exh.)

Courts have upheld upward departures even when the victims' suicide attempts were unsuccessful. E.g., United States v. Reyes-Rivera, 812 F.3d 79, 91 (1st Cir. 2016) (affirming upward departure when "[s]ome of the [defendant's fraud victims] have attempted suicide" even though none succeeded). The sentencing guidelines themselves suggest that where a crime results in death, an upward departure to near the statutory maximum would often be appropriate, but not "automatic[]." Cf. former USSG § 5K2.1 ("If death resulted, the court may increase the sentence above the authorized guideline range. Loss of life does not automatically suggest a sentence at or near the statutory maximum.").

## B. Defendant Waited for Charles Wilding to Die

It does not appear that defendant caused Charles Wilding to die. By his own admission, Charles Wilding was alive when defendant first attempted to burglarize his home. Despite leaving Wilding's home using the "welfare check" ruse, defendant continued to watch the home, as though expecting Mr. Wilding to die. But defendant passed a polygraph examination in which he insisted he had nothing to do with Mr. Wilding's death. Nevertheless, it does appear that defendant recognized that Mr. Wilding was not long for this world and instead of alerting Mr. Wilding's family members, social services, or medical

professionals, just waited for him to die so that he could more easily steal his property.  Worse, defendant's plan worked.  That he had the foresight to pursue this plan suggests both that defendant is unusually ruthless and predatory, and that he had successfully employed his watch-and-wait plan before.

### C. Defendant Illegally Possessed a Firearm

While defendant claims that he is "not a violent person" (PSR ¶ 61), there is evidence to the contrary.  First, he has been convicted of battery.  (PSR ¶ 106.)  Second, he has twice been convicted of hit-and-run causing injury, which may not seem violent to defendant, but doubtless feels different to those he injured. (PSR ¶¶ 116, 124.)  But most importantly, there is substantial evidence that defendant possesses firearms despite his more than twenty felony convictions.  In 2018, for example, defendant was arrested as a felon in possession of a firearm, although charges were later dropped for insufficient evidence.  (PSR ¶ 144.).  And when investigators arrested defendant in this case, they found in his hotel room a "box for a gun safe," and in his truck "Ammunition, which was hidden behind the back seat."  (ECF 1, Complaint ¶¶ 8(j) and 9(b).)  Further, defendant made recorded calls from jail in which he uses coded language to ask his friends to claim ownership of the ammunition found in his truck because it would be legal for them to possess it, but not for defendant.  (Versoza Decl. ¶ 8.)

### D. Defendant's Criminal History Understates His Likelihood of Recidivism

Defendant is indisputably in criminal history category VI, the highest.  Yet even this category understates defendant's likelihood of recidivism.  (PSR ¶ 105.)  Thirteen criminal history points are

required for category VI.  But defendant has 36 points, almost *three times* the number required.  And even 36 criminal history points do not do justice to defendant's criminality.  Defendant garnered no criminal history points at all for ten separate convictions because they occurred more than fifteen years ago.  (PSR ¶¶ 106-115.)  To be sure, a dated conviction may say little about a defendant today if, for example, the defendant had fifteen crime-free years of gainful employment in the interim.  But nothing could be further from the truth for this defendant.  He has no verified history of employment beyond working in jail (PSR ¶¶ 186-191), and has merely cycled from committing new crimes when free to serving prison sentences for those new offenses.  Further, some of defendant's uncounted convictions are serious.  (PSR ¶ 114: zero criminal history points for possession of methamphetamine for sale; ¶ 115: zero criminal history points for 64-month prison sentence for grand theft auto, burglary, and evading the police.)

    Defendant has proven himself exceptionally hard to deter.  Of course the threat of probation or parole revocation has seemingly had no effect on defendant, who has repeatedly violated those forms of court supervision.  (PSR ¶¶ 110 probation revoked, 117 parole revoked twice, 118 probation revoked, 125 probation revoked.)  And while it is perhaps not surprising that shorter sentences of a year or two in custody (PSR ¶¶ 109, 110, 111, 112, 113, 114, 116, 119, 122, 125, 127) have been insufficient to get defendant to change his ways, even substantial sentences to date have only protected the public from defendant while he was in custody, and have failed to deter him from committing more crimes.  Even sentences of several years have had no effect on defendant's criminality.  For example, he received a five-

year prison term in 2007 for sale/transport drugs, and was paroled three times, resulting in two parole revocations. (PSR ¶ 117.) Then, less than one month after being paroled for the third time, defendant was arrested for and convicted of a new crime. (PSR ¶ 118.) Similarly, defendant's crimes were not halted by his five-year prison term in 2011 for false personation of another. (PSR ¶ 120.) Four months after his release from that sentence, he was arrested for burglary and sentenced to another 36-month term. (PSR ¶ 121.) Even defendant's longest sentence to date, 64 months in prison, was not long enough to get defendant to change his ways. The month following his release from that sentence, defendant was arrested for hit-and-run causing injury and sentenced to another 24-month prison term. (PSR ¶¶ 115-116.) Incredibly, the same pattern occurred after defendant's four-year prison sentence for first degree burglary. Less than 11 months after being paroled, defendant was again arrested for a second hit-and-run causing injury, and sentenced to another 32-month prison term. (PSR ¶¶ 123-124.) It is a sad but inescapable conclusion that the only way to protect the public from defendant is to incarcerate him.

It appears that defendant has spent at least half of his adult life behind bars. Further, defendant's criminal history shows that he is dangerous, twice having been convicted of hit-and-run with injuries, in addition to his many drug trafficking and first degree burglary convictions. Coupled with the evidence that he also illegally possessed a firearm just before his arrest, it is apparent that defendant poses a physical and as well as financial danger to the community. Because repeated sentences of five years and 64 months in custody have been insufficient to deter defendant, a much

longer sentence is necessary to either deter defendant, or protect the community from him.

### E. Defendant is More Deserving of a Lengthy Prison Sentence than Co-Conspirator Herrling, Who Received a 240-Month Sentence

The three critical players in this conspiracy were defendant, who found and burglarized the Wilding home beginning the fraud, Caroline Herrling, who defendant later brought in to organize the fraud and was its public face in probate court, and James Kantor, whose years of litigation within his family over trusts and estates had given him the technical knowledge to fabricate realistic looking wills.

While defendant began the fraud and brought Herrling into it, her greater competence and ability to get things done meant that she gradually took on a bigger role, overshadowing defendant. In a text exchange that Herrling saved as a screenshot on her phone, defendant praised Herrling's competence and role in the scheme, but reminded her that the scheme started with his finding the victim, so defendant should not be forgotten:

> And yeah your role has gotten bigger and bigger and all this you're taking on more and more of a role and responsibility and stepped up [to] the plate and to be honest with you I am amazed at you but it should never diminish what started this [i.e., that Kroth found the perfect victim in Charles Wilding]

(Versoza Decl. ¶ 2.)  Herrling herself also suggested, at least early in the conspiracy on May 10, 2021, that defendant controlled the money.  On that day, co-conspirator James Kantor asked Herrling for action, explaining "And by action, I mean $".  Herrling replied, "the money isn't mine to just give out and [defendant] Jason [Kroth] said no."  (Id.)

14

1  To be sure, ultimately Caroline Herrling became the top

2  organizer of this conspiracy, and in many ways behaved the worst.  In

3  addition to using her considerable intelligence and organizational

4  skills to steal from Robert Tascon and the estates of Charles Wilding

5  and Jackie Lowenstein, she also engaged in the grisliest aspects of

6  this conspiracy:  attempting to dissolve Charles Wilding's body in

7  chemicals, before hacking his body to bits and dumping it in the

8  ocean.  Caroline Herrling well-deserved her four-level role

9  enhancement and 240-month prison sentence.

10  But the Court could not have sentenced Herrling to more than 240

11  months in prison, as that was the statutory maximum for the sole

12  count to which she pled guilty:  conspiracy to commit wire fraud, in

13  violation of 18 United States Code Sections 1343 and 1349.

14  Defendant, in contrast, pled guilty both to the same wire fraud

15  conspiracy that Herrling did, but also to possession of

16  methamphetamine with intent to distribute (PSR ¶ 3), which exposes

17  defendant to a combined statutory maximum term of 60 years, three

18  times what Ms. Herrling faced.  And aside from Herrling, defendant

19  was the most culpable participant in the fraud.  This reflected in

20  the share of the fraud proceeds defendant received, which were

21  several times higher than any other participant except for Herrling,

22  who naturally got the lion's share.  (Versoza Decl. ¶ 5.)

23  Still, there is one critical factor that overwhelmingly calls

24  for a longer sentence for defendant than for Caroline Herrling:

25  criminal history.  Co-conspirator Herrling had a single criminal

26  history point for a misdemeanor trespass conviction from 2011.

27  (2:23-CR-59-MEMF, PSR ¶ 108.)  As discussed in more detail in the

28  previous section, defendant has **36** criminal history points, thirty-

six *times* as many as Herrling.  (PSR ¶ 130.)  Of course this is not fully reflected in defendant's guideline range because the guidelines stop considering additional criminal history points beyond 13.  But Herrling and defendant are polar opposites in criminal history. Defendant has 22 separate convictions.  (PSR ¶¶ 106-127.)  Each one of those was an opportunity for him to consider his path and to change it.  Some convictions actually provided him with multiple such opportunities, as he was repeatedly paroled or given probationary sentences, only to reoffend.  Considering the gulf between the criminal history points of Herrling and defendant, most of which is not reflected in their guideline ranges, the government believes that defendant should receive a noticeably longer sentence than Herrling to avoid unwarranted disparities.

### F.    Defendant's Purported History of Abuse Does Not Justify Leniency

Defendant reported to Probation, and then to the Court, a history of horrible abuse as a child, resulting in depression and PTSD.  There are reasons to be skeptical of this claim.  His treatment records do not reflect these mental illnesses.  (PSR ¶ 169(a):  "The documentation received from Tarzana Treatment Center did not mention that Kroth was diagnosed with any mental or emotional health illness.")  But even if this history of abuse is not exaggerated in hopes of leniency, it would not warrant a below-guidelines sentence.  To be clear, the government does not doubt that defendant had a difficult childhood; it is almost not possible that someone who avoided drugs and abuse as a child could commit all the crimes for which defendant was convicted.

1    While that makes it more understandable that defendant would

2  become a drug addict and predator, it also suggests that defendant is

3  very likely to return to his criminal ways once he leaves prison.

4  Defendant argues that he is now perfectly situated to lead a law-

5  abiding life with the help of his generous and caring sister.  We do

6  not have the transcripts from defendant's twenty-two previous

7  sentencing hearings, but it is unlikely that he told those judges "as

8  soon as I get out, I am going to return to drugs, identity theft, and

9  first degree burglary"—yet that is exactly what he did.

10    It is clear that defendant has had a long-term drug problem,

11  especially with methamphetamine.  (PSR ¶¶ 174-177.)  "Chronic

12  methamphetamine abuse has devastating effects on the central nervous

13  system. . . . The mainstay of treatment for the problems associated

14  with chronic methamphetamine abuse is abstinence."

15  https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3148451/

16  It is to be hoped that defendant's forced abstinence from illicit

17  drugs while in prison will help defendant.  (PSR ¶ 178: defendant no

18  longer uses drugs while in jail.)  Because "[s]ubstance abuse is

19  highly correlated to an increased propensity to commit crime," drug

20  "dependence or abuse ordinarily is not a reason for a downward

21  departure."  Former USSG § 5H1.4.  Instead, the guidelines properly

22  emphasized substance abuse treatment:  "[I]t is highly recommended

23  that a [substance abusing] defendant who is incarcerated also be

24  sentenced to supervised release with a requirement that the defendant

25  participate in an appropriate substance abuse program."  Id.  To be

26  sure, previous drug treatments have failed to halt either defendant's

27  addiction or his criminality.  (PSR ¶ 118: In 2010, defendant was

28  terminated from his Prop 36 drug treatment for failing to appear;

17

¶ 179(a)(ii): "In June 2015, Kroth left [drug] treatment without notification after one day of treatment"; ¶ 179(a)(i): after two months of drug treatment, "Kroth told staff that he did not want to extend his treatment another 30 days".)  Nevertheless, the government hopes that defendant will continue to take advantage of the myriad drug treatment programs available in prison (PSR ¶ 180), including especially the Residential Drug Abuse Program ("RDAP"), for which he appears eligible.

But to believe defendant's claim that this will be his last conviction would be a triumph of wishful thinking over decades of hard experience—and pain for defendant's victims.

### G. CONCLUSION

The government calculates defendant's guideline range as 262 to 327 months in prison, based on a final offense level of 34, and a criminal history category of VI.  This varies from the range established by the Presentence Report in that it applies a two-level enhancement for an abuse of position of trust when defendant lulled victim Charles Wilding, who was alive and home when defendant first burglarized his residence, by falsely pretending his entry into the home was as a trusted government employee authorized to conduct welfare checks on the infirm and aged, and not a crime that should be reported to the police.  Defendant's egregious criminal history and his wanton disregard for the welfare of Charles Wilding—waiting for him to die so he could more easily rob him rather than summoning the aid he so obviously needed—warrants a sentence at the high end of the guideline range.  Nevertheless, given defendant's age, and his waiving of indictment and prompt guilty plea, the government recommends a sentence of 300 months, a round number and one higher

than the 240 months Herrling received to reflect the gulf between their criminal history points.

Dated: January 14, 2026          Respectfully submitted,

                                 TODD BLANCHE
                                 Deputy Attorney General

                                 BILAL A. ESSAYLI
                                 First Assistant United States Attorney

                                 ALEXANDER B. SCHWAB
                                 Assistant United States Attorney
                                 Acting Chief, Criminal Division


                                 *Andrew Brown*
                                 ANDREW BROWN
                                 Assistant United States Attorney

                                 Attorneys for Plaintiff
                                 UNITED STATES OF AMERICA

### Declaration of Lyndon Versoza

I, LYNDON VERSOZA, do hereby declare and affirm:

1.    I have been a Postal Inspector since 2005.

2.    I have reviewed the accompanying brief, which contains many quotations from digital devices seized in this investigation.  The quotations accurately reflect what was on the digital devices.

3.    I have attached an exhibit in this case, which is a summary of my interview with Robert Tascon's attorney.

4.    Defendant Kroth admitted to me that he stole among other things from the home of Charles Wilding piles of mail and documents, which he gave to his co-conspirator Caroline Herrling to aid in their identity theft scheme.  I later reviewed some of these documents which were seized by subsequent search warrants and saw that it included a number of documents and pieces of mail from Jackie Shields Lowenstein, who had been a friend of Charles Wilding's mother, June Wilding.  It was from these documents that defendant's co-conspirators Caroline Herrling and James Kantor got the personal identifying information of Ms. Lowenstein as well knowledge of her home.  They used this information to fabricate a Lowenstein will that purported to leave her estate to Charles Wilding, an identity that they had already stolen and controlled.  In this way, the conspirators attempted to steal two estates—Wilding's and Lowenstein's—using the information defendant Kroth stole from the Wilding home.  Critical to this scheme was placing the fabricated Lowenstein will into a location that it might be reasonably found. The conspirators agreed to use June Wilding's actual safety deposit box as the "finding place" for the will.  They had access to this

safety deposit box because defendant Kroth had found the safety
deposit box key while burglarizing the Wilding home.

5.   I have attempted to trace the proceeds of the frauds in this
case.  It is not possible to do so completely, however, because some
of the money was withdrawn as cash.  Nevertheless, the person who
received the most money was clearly Caroline Herrling.  The extant
financial records show that the next most highly paid conspirator was
Jason Kroth, who got at least $240,000.  Most of the other
participants received far less.  Financial records show, for example,
that Caroline Herrling paid the following co-conspirators the
following amounts:

Hadley Pelletier: $67,000

Kenneth Salinas: $5,000

James Kantor: $64,000

Samuel Shtolzberg: $40,000

6.   I found on Caroline Herrling's iPad a fabricated will for
one "Mary Held" which purported to leave $100,000 from her estate to
"Jason Matthew Kroth."

7.   When we arrested defendant Kroth, we also searched his
long-term motel room, which contained the kind of valuables you would
expect to find at an estate auction, including a stamp collection.
The Lowenstein estate contained substantial personal property
including collectibles such as stamps, which the administrator had
put into storage.

8.   I reviewed some of defendant Kroth's recorded jail calls
from March of 2024 in which he asks his friends to get someone to
claim ownership of the ammunition found in his truck, which is a
felony for him to possess.  The call is coded, which leads to many

misunderstandings, as defendant Kroth refuses to speak plainly, likely because he knows the calls are recorded.  He keeps referring to "between four and five," by which he seems to mean .45 caliber ammunition.  At one point he starts listing ammunition types such as "three eighty" (.380 caliber), "nine" (9mm), and "forty" (.40 caliber) to get his meaning across.  Finally the person defendant Kroth called understands:  "Oh, this call is being recorded. Oh fuck. Okay. I got it."  Defendant Kroth explains "That's why I told you to call our two friends. They have no record," meaning they would face no charges if they falsely claimed the ammunition was theirs, exonerating Kroth.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: January 14, 2026

/s Lyndon Versoza

Inspector Lyndon Versoza

**UNITED STATES POSTAL INSPECTION SERVICE**
**IS FORM 75 – REPORT OF ACTIVITY**

Page 1 of 2

| CASE NUMBER | PROGRAM | DIVISION | DOMICILE | ACTIVITY DATE | START TIME: | END TIME: |
|---|---|---|---|---|---|
| 3816278-IMT | Los Angeles | Alameda | 5/15/2023 | 1:30 PM | 2:00 PM |

| SUBMITTING EMPLOYEE | WRN | ACTIVITY TYPE |
|---|---|
| 6098 | Interview |

REPORT TITLE
May 15, 2023 Telephonic Interview of Travis Hartgraves

## DETAILS

1.  On May 15, 2023, at approximately 1:30 PM Pacific Time, I interviewed Travis Hartgraves telephonically. Also present on the call was AUSA Andrew Brown. Mr. Hartgraves worked for Ladyman Law Offices in Texas was the case manager for the Robert Tascon. Ladyman Law Offices represents the estate of Robert Tascon.

2.  During the interview, Mr. Hartgraves provided the following information:

3.  Mr. Hartgraves stated that Mr. Tascon came from a wealthy family. His family set up two trusts in California before 2018. Because of the trusts, Mr. Tascon did not work and had enough money to spend freely. However, Mr. Tascon fell into bad company and developed an alcohol problem. To distance himself from negative influences and his destructive lifestyle, in 2018, Mr. Tascon's girlfriend, Miracle Williams, convinced him to move to Abilene, Texas.

4.  Mr. Tascon owned two properties in California. The first property, located in Van Nuys, was occupied by a squatter who refused to leave and eventually caused a fire that destroyed the house. As a result, the Van Nuys property was sold at a significant financial loss. The second house was the house in Encino on Louise. Mr. Tascon did not want to sell the Encino house but Olivia Curren took occupancy and squatted in the property. The neighbors often called the police for drugs and gang activity at the house. The house was run down, but it was in a beautiful exclusive area in Encino. The comps for the Encino house at the time showed values of $2.5 to $3.5 M. However because of the squatting situation, Mr. Tascon was unable to sell the home. Mr. Tascon filed a lawsuit to evict Ms. Curren. Mr. Tascon attempted suicide in 2021. He was placed on anti-depression medication and Mr. Tascon was committed for about 2 weeks to a treatment center. After his discharge from treatment, Ms. Williams and her father provided constant support and supervision to ensure Mr. Tascon was never alone.

IS Form 75
Report of Activity
Updated 6.2.2023
All previous versions of this form are obsolete

**Law Enforcement Sensitive**
*This report is the property of the U.S. Postal Inspection Service. Possession, dissemination, distribution, or copying of this report or its contents is prohibited without express permission of the U.S. Postal Inspection Service.*

EXHIBIT

## UNITED STATES POSTAL INSPECTION SERVICE
## IS FORM 75 – REPORT OF ACTIVITY

Page 2 of 2

5. The squatter counter-sued for a Temporary Restraining Order, which failed. The squatter suit ended in August of 2021. In September 2021, the Encino home was fraudulently sold. Concerned neighbors contacted Travis to express their gratitude for the apparent resolution of drug and gang issues at the property. It was through this communication that Mr. Tascon discovered the fraudulent sale of his home. Because of the timing and legal battle, Mr. Tascon believed there was a long-term plan to fraudulently sell the property. The house was the last thing and asset he had to his name (although he still had monthly payments from the trusts). Mr. Hartgraves said, "The fraudulent sale just about crashed him." The only time he was left alone by Ms. Williams and her father, he committed suicide.

6. Mr. Hartgraves, who had extensive involvement in the discovery process for the lawsuits, observed Mr. Tascon's fluctuating emotional state. Mr. Hartgraves said that Mr. Tascon would be in a good mood, then down in the dumps. Mr. Tascon told him that "I am never going to get my house back." The fraudulent sale of his home was the final straw; it consumed him. The lawsuit was more than he could deal with. Mr. Tascon did not know the people listed in the fraudulent sale of his house, like Janice Yeh and Jason Kroth. Mr. Tascon left a will bequeathing his assets to Ms. Williams, however with the fraudulent sale of the Encino home, he had nothing left to leave Ms. Williams.

7. Mr. Hartgraves law firm were engaged in a legal battle against the buyer of the Encino home; however, after Mr. Tascon's death, they did not have any funding to continue the legal fight. Mr. Hartgraves firm negotiated a small settlement for Mr. Tascon's estate.

### REFERENCE

1. Travis Hartgraves, Case Manager, Ladyman Law Offices PC, 541 East South 11th Street, Suite 102, Abilene, Texas   79602 (325) 676 1775, thartgraves@ladymanlaw.net
2. Miracle Williams, (Robert Tascon's girlfriend) ███████████

END OF REPORT

| SUBMITTING EMPLOYEE | WRN | SIGNATURE | DATE SUBMITTED |
|---|---|---|
| 6098 | *Lyndon Versoza* | |
| REVIEWING EMPLOYEE | WRN | SIGNATURE | DATE REVIEWED |
| | | |

IS Form 75
Report of Activity
Updated 6.2.2023
All previous versions of this form are obsolete

**Law Enforcement Sensitive**
*This report is the property of the U.S. Postal Inspection Service. Possession, dissemination, distribution, or copying of this report or its contents is prohibited without express permission of the U.S. Postal Inspection Service.*

EXHIBIT